# EXHIBIT H

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO,
WESTERN DIVISION

FAIR HOUSING OPPORTUNITIES
OF NORTHWEST OHIO, et al,

Plaintiff, Case No. 3:23-CV-01297
vs. Judge: Jeffrey J. Helmick

EDWARD ROSE DEVELOPMENT COMPANY, LLC.,
Defendant.
____________________________________/

DEPOSITION OF SILMA E. ESPINOSA,
Taken by the Plaintiff on the 14th day of June, 2024,
at the Hilton Garden Inn, at 101 N. Summit Street, Toledo,
Ohio, at 11:00 a.m.

APPEARANCES:

For the Plaintiff: Mr. Jacob Davis - Bar #101745
Nalls-Davis
33 White Allen Avenue
Dayton Ohio 45406
937-620-2137
jacob.davis@nallslaw.com

For the Defendant: Ms. Haba K. Yono - P81114
Honigman LLP
2290 First National Bldg.
660 Woodward Avenue
Detroit MI 48226-3506
313-465-7372
hyono@honigman.com

Reported by: Shalaan K. Fisher, CSR-2284

Fortz Legal Support
www.FortzLegal.com
844.730.4066

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO,
WESTERN DIVISION

FAIR HOUSING OPPORTUNITIES
OF NORTHWEST OHIO, et al,

Plaintiff, Case No. 3:23-CV-01297
vs. Judge: Jeffrey J. Helmick

EDWARD ROSE DEVELOPMENT COMPANY, LLC.,
Defendant.
____________________________________/

DEPOSITION OF SILMA E. ESPINOSA,
Taken by the Plaintiff on the 14th day of June, 2024,
at the Hilton Garden Inn, at 101 N. Summit Street, Toledo,
Ohio, at 11:00 a.m.

APPEARANCES:

For the Plaintiff: Mr. Jacob Davis - Bar #101745
Nalls-Davis
33 White Allen Avenue
Dayton Ohio 45406
937-620-2137
jacob.davis@nallslaw.com

For the Defendant: Ms. Haba K. Yono - P81114
Honigman LLP
2290 First National Bldg.
660 Woodward Avenue
Detroit MI 48226-3506
313-465-7372
hyono@honigman.com

Reported by: Shalaan K. Fisher, CSR-2284

A I do not.
Q Okay. Where do you currently reside?
A Toledo.
Q Toledo?
What is your address?
A 5469 Greenridge, all one word, Drive; that's 43615.
Q Is that a home?
A townhome?
A A house.
Q It's a house?
A Yes.
Q Did you purchase the house?
A Yes.
Q Okay. And when did you purchase it?
A March of this year.
Q So, is the house in your name?
A Not just my name.
Q Is it in your wife's name as well?
A Yes.
Q What is your wife's name?
A Ashley Espinosa.
Q Have you been living there since March of 2023?
A No.
Q I'm sorry. Have you been living there since March of 2024?

A No.
Q How long have you been living there for?
A April of this year.
Q Where did you previously reside?
A Prairie Lake Village.
Q And you moved because you purchased this house?
A Yes.
Q Where did you live in 2021?
A Glendale Village Apartments.
Q How long had you lived there for?
A I want to say, I can't remember. I want to say at least a year-and-a-half about. About that.
Q A year-and-a-half?
And who did you live there with?
A Ashley Espinosa.
Q Do you recall how much your rent was at Glendale Village?
A It changed.
Q What was it initially, if you recall?
A I don't recall initially how much it was.
Q So, what was the most recent you were paying before you moved?
A Before I moved from where?
I'm sorry.
Q Before you moved from Glendale, I guess, to

Prairie Lake; is that correct?
A Yes. I moved from Glendale Village to Prairie Lake Apartments, my rent at Glendale was approximately between $650 and $750, around there.
Q Just going to back to the house you purchased, how much did you purchase that for?
A $252,000 and some change.
Q All right. What is your mortgage payment?
A About $2,300.
Q Do you and Ashley split that --
A Yes.
Q -- half-and-half, you would say?
A Approximately, coming out of our joint account.
Q So, you lived at Glendale for a year-and-a-half.
So, when did you start living there?
A Summer of the previous year, so, it would be 2020.
Q Okay. And you lived there until the end of 2021?
A Last month's rent, I believe, was January of the following year.
Q Did you have any animals that lived with you when you were at Glendale?
A Yes.
Q What animals were they?
A Two animals, a dog and a cat.
Q Okay. Which animal is yours?

A The cat.
Q Okay. And was the dog Ashley's?
A Yes.
Q So, was the cat living with you from the Summer of 2021 until the end of --
I apologize.
Was the cat living with you during that alteration on Glendale?
A Yes.
Q What is the cat's name?
A Stitch.
Q Stitch?
How long have you had the cat for?
A Since I moved in to my brother's house.
Q Okay.
A So, that was -- I can't recall the exact -- It was between 2015 and 2017, around that time.
Q Okay. You have had the cat since 2015, 2017?
A Yes.
Q Did you adopt the cat or --
A Yes.
Q So, you moved in with your brother around 2015; is that correct?
A About that time. Again, 2015 to 2017, around there.
Q What is your brother's name?

ESA without any additional charges?
A I'm sorry. Can you rephrase the question?
Q So, does Glendale allow for any animals to reside at the apartment without any additional charges?
A I'm going to say, if it's an ESA, then yes. They allow --
Q If it's a pet, do they charge?
A They don't allow pets.
Q They don't allow pets?
A Correct.
Q So, you had your pet in the Summer of 2020 through the end of 2021 --
A No.
Q -- at Glendale?
No?
A You said, "pet". He is not a pet. He is a support animal.
Q You had Stitch until in Summer of '20 through end of 2021; isn't that correct?
A Yes.
Q So, no pets were allowed at the apartment.
So, do you recall when in the Summer of 2020 you moved in to Glendale?
A I don't recall.
Q All right. So, Stitch was an ESA at Glendale, correct?

A Correct.
Q Did you have any other accommodations while living there?
A Just myself?
Q For you. Yes.
Did you make any other requests for accommodations while living at Glendale?
A No.
Q So, the only accommodation request you had was for an Emotional Support Animal, correct?
A For myself, yes.
Q All right. And then just for purposes of this deposition since I think, you stated it and I have stated it as well, when I use the shorthand "ESA," I'm just going to be referring to Emotional Support Animal.
Does that make sense to you?
A Yes.
Q Okay. Perfect.
Are you currently employed?
A Yes.
Q Who is your employer?
A Toledo Municipal Court, City of Toledo.
Q Toledo Municipal Court, City of Toledo; what is your position there?
A Court Services Commissioner.

Q What do you do as a Court Services Commissioner?
A I oversee a staff of eight people. One of them is my assistant who does various job duties for the judges as well as ancillary services for the court.
Q So, what tasks does your staff do for the judges?
A They set court dates according to their calendars. Some staff deal with electronic monitoring. Some staff deal with ordering interpreters for the courtrooms. Some staff deal with appointed counsel fees, whoever needs to be paid. Some staff deal with civil cases. Some staff deal with criminal, traffic cases. Actually, all staff deal with criminal, traffic cases and just small duties such as mail; things like that.
Q So, you just listed off, like, several tasks that your staff does.
What do you do, I guess, on a day-to-day basis?
A I'm answering questions that my staff may have and/or my assistant. Whenever a judge is off and needs another judge to cover their courtroom, I will secure a visiting judge to come in to the court to handle that mandatory courtroom. I also report to my boss with any issues going on within the office that may need to be addressed. I also handle the judge's calendar, I guess you could say, as to where the judges are going to be on any given week. That's not all inclusive, but

that's what I can think of off the top of my head usually on a day-to-day basis.

Q All right. So, you also look at judges' calendars to see where they will be at any given week and you stated before, there may be, like, traffic court or then, like, civil?

Where do you mean, where they would be at any given week?

A So, judges have their own courtrooms and there's three courtrooms that are mandatory courtrooms, misdemeanor arraignments, felony arraignments and duties courts. Those three courtrooms have to go on at the set times for them. If a judge is scheduled to be in that courtroom that week and is unavailable, I will contact the visiting judge to come in to cover that courtroom, so, the court can still proceed as per usual.

Q Was this an appointed position?

A No.

Q How long have you been working there for?

A September of 2020.

Q Where did you work previously?

A The Fair Housing Center.

Q And how long did you work at The Fair Housing Center for?

A I started as an intern during my last semester in

college and I was employed January of the following year, so, 2017.
Q And then your last semester of college, when was that?
A The Fall of 2016.
Q And then it started when?
A As an employee in January of 2017.
Q What was your position there?
A I believe, it was Fair Housing Specialist.
Q How long did you work there for?
A Until Toledo Municipal Court which was September 2020.
Q When you went to Toledo Municipal Court in September 2020, was it as a Court Services Commissioner or did you hold another position there?
A I held another position.
Q What position did you hold?
A Court Services Specialist.
Q Okay. And then were you, I guess, promoted or --
A Yes.
Q -- or applied?
Okay. When were you promoted?
A To what position?
Q I guess, yes.
What other positions have you held at Toledo Municipal Court?
A Sorry. Court Services Assistant Commissioner and then

Q Who is your supervisor?
A Kevin Aller (phonetic).
Q Okay. And what is his role?
A Deputy Court Administrator.
Q Do you have to report to work everyday or is it hybrid?
A Report to work everyday.
Q And what times?
What times do you work?
A Currently it's between 8:00 and 4:00 p.m.
Q Five days a week?
A Yes.
Q Where is the Toledo Municipal Court located?
A Downtown Toledo.
Q All right. Do you hold a driver's license?
A Yes.
Q Do you drive yourself to work?
A Not everyday.
Q How do you get to work?
A Either I would drive or my wife will drive.
Q Does she also work at the court?
A Yes.
Q What is her role there?
A Assistant Prosecutor.
Q So, you are not sure when you became Court Services
Commissioner. You may have became that in either --

Is the complainant the one who dictates the outcome that they would like?

MR. DAVIS: Objection. Calls for speculation, but can you answer?

THE WITNESS: Yes.

BY MS. YONO:

Q The complainant, and so, The Fair Housing Center basically treats the complainant as a client; is that correct?

A Correct.

Q So, if the complainant didn't want to proceed forward with the complaint, with the administrative agency or court, The Fair Housing Center wouldn't move forward with that; is that correct?

A Yes.

Q Did you have any accommodations for your job with The Fair Housing Center?

A No.

Q Did you ever request to bring in your cat in to The Fair Housing Center?

A No.

Q What about at your current job?

Any accommodations?

A No.

Q You have never requested to bring your cat, Stitch, to

the court?
A No.
Q So, you stated earlier that your wife is an Assistant Prosecutor.
Was she also an Assistant Prosecutor in 2021?
A I don't recall.
Q Do you recall what her job was in 2021?
A I don't recall.
Q How much does your wife make as an Assistant Prosecutor?
A Between $60,000 and $70,000. I want to say, a year.
Q Do you recall how much she was making in 2021?
A About $50,000 to $55,000 a year.
Q Was she working in public service at that time as well?
A I believe so.
Q As a criminal attorney?
A Her jobs varied. There was a time period where she went from -- different jobs.
Q Do you recall what she previously was working before becoming an Assistant Prosecutor?
A She was a Prosecutor in another county.
Q What is your disability?
A I have bi-polar and generalized anxiety disorder.
Q When were you diagnosed with bi-polar?

Q Okay. And do you recall who diagnosed you?
A A doctor at Flower Hospital.
Q Had you gone in to the hospital for your generalized anxiety?
A Not just that. No.
Q Why were you in the hospital for at that time?
A Suicidal thoughts.
Q So, what has been the treatment for your generalized anxiety and your bi-polar disorder?
Has it been the medication that you have been given?
A That and therapy.
Q And who is your therapist?
A Kristina Hamler (phonetic).
Q Kristina Hamer (sic) (phonetic)?
A Hamler.
Q And does she have an office?
A Yes.
Q What's her office's name?
A Perrysburg Counseling Services.
Q How long have you been seeing her for?
A Approximately, a year. If not, a little bit over that.
Q How often do you see Kristina?
A It varies.
Q On average?

A Correct.
Q Okay.
A May I say something?
Q Just wait until the question is asked.
A Okay.
Q So, how did you find about Tracy Creek Apartments?
A Google Search.
Q Okay. When did you find out about Tracy Creek Apartments?
A Summer of 2021.
Q And why were you looking?
A My wife and mine's lease was about to end.
Q At Glendale?
A Correct.
Q Was it for a year?
A Yes.
Q And why did you want to move from Glendale?
A Closer to work, closer to my family.
Q Closer to your work and to your family?
A Yes.
Q You were working at the Toledo Municipal Court at that time; is that correct?
A At what time?
I'm sorry.
Q At the time of 2021.

A Yes.
Q So, what were you looking for in the next place you lived?
A A couple -- various things, first floor apartment. We had an older dog that was Ashley's. Closer to work, as I said, closer to family; things like that.
Q So, how far was Glendale from the court?
A With traffic, about 20 to 25 minutes.
Q So, how close -- how much closer were you looking to live?
A Just anything that was less than that, to be honest.
Q Okay. So, if there was something that was just like 18 or so minutes, you would be fine with that as well?
A Depending what the apartment complex offered, yes.
Q Okay. And you said, family as well.
How far was your family from you, from Glendale?
A My sister lived in Perrysburg.
Q Okay. So, you were looking to live closer to your sister?
A Correct.
Q Do you know where in Perrysburg she lived?
A Perry Lake Village.
Q Did you look at moving to Perry Lake Village?
A Yes.

Q What was that?
A I don't recall. I just know, we had one.
Q So, in the Summer of 2021, you were looking online and you saw, you know, Perry Lake Village Apartments; is that correct?
A No.
Q And you knew of Perry Lake from your sister?
A Correct.
Q Did you inquire with Perry Lake Village about moving there?
A Yes.
Q When did you inquire with them?
A Multiple times, but I don't remember the first date.
Q Do you recall the month and the year?
A I would have to say, that same year that I applied or talked to Tracy Creek Apartments.
Q Okay. And what happened with that?
A They didn't have any availability.
Q Any other apartment complex?
Well, actually any other housing you were looking for?
A I'm not --
MR. DAVIS: Objection to the form.
BY MS. YONO:
Q You said, you were looking at Tracy Creek.

bedrooms?
Anything else?
A Price may not have fit within our budget at the time.
Q Well, what had the price been?
What would have fit in to your budget?
MR. DAVIS: Objection. Asked and answered, but you can answer.
THE WITNESS: I don't remember what our budget was, so, I would not be able to tell you. I'm sorry.
BY MS. YONO:
Q Was it less than $1,000 value to pay a month?
A Like I said, I don't remember what our budget was. I'm sorry.
Q Did you apply for any of these?
Did you apply to any apartments in June?
Well, strike that.
Did you apply to any other apartment complexes in the Summer of 2021?
A No.
Q So, you just called all of these places to gather information?
A Correct.
Q Did any of these apartment complexes send you messages or emails?
A I don't recall, but not to my knowledge.

would change from between $800 to, like, $1,000?
Would that be correct?
A Utilities?
Q Utilities for that, yes, you paid.
A I'm sorry. So, just rent and electric range between
$800 and $1,000 or --
Q Rent, electric and you said, you also paid for gas?
A Yes. So, between $800 and $1,000, I would say, yes.
Q So, you said, with Tracy Creek, you looked online?
You found them online; is that correct?
A Correct.
Q All right. Do you recall if it was just Google?
Did you go to a particular website?
A Google.
Q Did you go on Tracy Creek's website or did you go on,
like, apartment.com?
A I may have visited both websites.
Q Okay. Did you input any information on the website?
A I may have. I don't recall.
Q Okay. What information would you have inputted?
A I believe, there was -- I don't know what the technical
term of -- kind of like, it asked me feature-type
things --
Q Okay.
A -- where you can get additional information. I

physician to get it. I communicated like, "I already have a letter." Basically, I can't submit that and she reiterated that they would have to communicate to the physician via fax.
Q Was there anything else discussed?
A Not to my knowledge.
Q Okay. Did you discuss utilities?
A That was prior to when I got in to Emotional Support Animal.
Q So, after you spoke about the Emotional Support Animal, nothing else was discussed?
A I was not interested any longer when she basically told me that my letter would not be accepted.
Q Okay. So, you were no longer interested in Tracy Creek after that call?
A Yes.
Q How long was this call?
A I don't recall exactly how long the whole entire call lasted.
Q Was it, like, five minutes?
A Like I said, I don't recall how long the whole conversation lasted. I'm sorry.
Q Yes. I'm just trying to understand with respect to this, what would you say it was?
Less than ten minutes?

A I would say, it was less than ten minutes. Yes. For sure.
Q So, let's go back to before you discussed the Emotional Support Animal, you discussed availability.
What is it that you guys discussed?
A What they had to offer, like, in regard to utilities, what utilities were included, not included. I wanted to make sure, I got enough information to give to my wife later on, so that way, we can determine whether or not this was a place that we wanted to move to and such.
Q You told her, you were looking for a two bedroom apartment?
A Yes.
Q Okay. What information did she give you?
A I'm sorry. Can you repeat that?
Q What information did she give you?
A She gave me the information about, I believe at the time, there was no availability.
Q Anything else that was discussed?
A I know, I mentioned the first floor, I believe. Just to see if they had any availability for the first floor two bedroom apartments, that's when she told me, there was no availability. So, that's why I was asking about additional factors, like, what they offered, that type

just like to note that for the record.
THE WITNESS: Sorry. Can you repeat the question?
BY MS. YONO:
Q Yes. If you had visited an apartment at Tracy Creek, and the apartment seems a little bit outdated, seemed like the amenities were old, would this have deterred you from applying?
MR. DAVIS: Same objection.
THE WITNESS: I would not say, it would have.
BY MS. YONO:
Q And why is that?
A Because the current apartment complex that we were living at, some of the amenities were outdated as well.
Q All right. So, going back to this conversation where you discussed the say, "ESA," how did that come up?
A I had asked about -- Well, she had asked me, "Do you have any pets?" The person on the phone.
Q Okay. And what did you say?
A I informed her that I had an Emotional Support Animal.
Q What was her response?
A "That's basically a pet."
Q And what else did she say?
A Well, then I had asked her, "Well, would I be charged for having an ESA?" And she informed me, "No. We

would just need some documentation to your physician via fax for them to fax over," like, the completed documentation back to wherever it goes to, I guess, for them to process.

Q Then did you say something else after she said that or did she have anything else?

A I informed her that I already had a letter from my therapist or I already had a letter, I should say.

Q Okay. Did you say anything else with respect to "I had a letter from my..."

You -- I apologize. You just informed her, you had a letter?

A I had an emotional support letter for my Emotional Support Animal.

Q That's what you told her?

A From my recollection. Yes.

Q And you didn't disclose --

Okay. And then you said, "I have a letter for my Emotional Support Animal."

What was said in response to that?

A She informed me that they would have to submit documentation to the physician, because basically, then my letter would not be accepted, because I had asked, "Can I submit my letter instead?" And she said, "No. We have to fax other documentation over to your

physician."
Q Okay. So, you said, "I have a letter. I have an Emotional Support Animal letter," and she responded, "We would have to submit documentation via fax to your provider"; is that correct?
A Not provider. Physician.
Q To your physician?
A Yes.
Q And then what?
And then did she say anything else?
A I believe, I clarified with her that to make sure I understood her correctly, because I had asked her, "Well, are you sure I can't just submit a letter that I have?"
Q Okay. You asked her that question?
A Something along those terms. Yes.
Q And what did she say?
A She reiterated what she said before, that they have to fax over documentation to my doctor -- physician.
Q Okay. So, she said when you asked her, "Can I submit the letter that I have?" She said, "We would have to submit documentation to your physician," correct?
A Yes.
Q Anything else that was said with respect to that?
A After she clarified the second time that same

statement, I guess, you could say, I believe, I was just like, "Okay. Thank you so much for your time," and I believe, the call ended after that.
Q All right. You would agree with me that the conversation you just described to me, she never stated, your letter would not be accepted?
She just stated that "We would have to submit documentation to your physician"; is that correct.
A I wouldn't agree with that whole statement.
Q She never explicitly -- Based on the conversation you just explained to me, she never explicitly told you, your letter would not be accepted?
MR. DAVIS: Objection.
MS. YONO: Is that correct?
THE WITNESS: I don't recall.
BY MS. YONO:
Q You and I, we just went through the conversation and that was everything you recalled as to the conversation with the Emotional Support Animal, and when you asked her, "I have this letter from my... I have this Emotional Support Animal letter," you recall that she explicitly told you -- Correct me if I'm wrong, that she said along the line that -- she said, "No. No." She said, "We would have to send over a form -- to fax over a form to your physician"?

A Correct.
Q So, this conversation that you recall sitting here today, she never explicitly told you, your letter, your Emotional Support Animal letter would not be accepted, correct?
MR. DAVIS: Objection.
THE WITNESS: Sorry. Like I said before, I don't recall if she explicitly said those exact words that you are saying.
BY MS. YONO:
Q So, it's possible that she never told you that your letter would not be accepted, correct?
A Yes.
Q Thank you.
As to the point when you said, I have -- when she asked if you had pets, and she said -- and you said, "I have an Emotional Support Animal," and she responded, "Well, they are basically..." -- "That's basically a pet," correct?
A Correct.
Q Have you seen a lease application for Tracy Creek Apartments?
A I don't believe so.
Q Okay. So, you are not aware that on the Tracy Creek application for the section with animals, it's actually

a pet section?

A I have never seen applications or lease, whatever you -- I can't remember exactly what you said, so, I don't even remember if there is an animal section on there.

Q So, there is a pet section on the application and then you can indicate if that pet is a service -- or if -- is that service or Emotional Support Animal?

Strike that.

On the application itself, it included a pet section and then you can indicate if you would need an accommodation under that pet section. So, is it possible when -- if this agent made that statement, she may have just been making it with reference to the application?

A I don't know.

MR. DAVIS: Objection to the form.

BY MS. YONO:

Q Okay. And you stated that she noted that "We would have to communicate with your -- that we would communicate with your physician"; is that correct?

A When you say, "we," are you meaning, Tracy Creek Apartments or --

Q Yes.

A That is correct.

Q So, you were never told during this conversation that a

The Fair Housing Center with respect to Tracy Creek?
A Initial phone call.
Q Okay.
A Intake, and then sometimes they would call me to give me a status update, saying, "Hey, this is what's going on with your case"; things like that.
Q How often would you get a status update?
A A month or a couple months.
Q When did you contact The Fair Housing Center about Tracy Creek?
A Shortly after my phone call to Tracy Creek.
Q Okay. Did you ever follow up with Tracy Creek?
A No.
Q And so, you never sent them an email?
A No.
Q You never called them?
A No.
Q Did you ever -- You never submitted your therapist's letter?
A No.
Q You never submitted an application?
A No.
Q So, you never --
All right. So, you contacted The Fair Housing Center shortly after your call at Tracy Creek.

Q That's from Columbia Gas of Ohio?
A I believe so. Yes.
Q Just going back to the narrative, you said, you may have emailed it to me, The Fair Housing Center or dropped it off?
A Yes.
Q Did you check your email account to see if you did email it to them?
A I know at some point, I did. I just don't remember if they needed it electronically or in-person. So, I didn't know if that was like -- if it was supplied to them originally via email or by drop-off.
MS. YONO: All right. Let's go off the record for now.
Let's just take a ten minute break. I want to review my notes.
(At 1:24 p.m., off the record.)
(At 1:40 p.m., back on the record.)
BY MS. YONO:
Q So, just a few more questions.
You would not have any knowledge that the agent you spoke to at Tracy Creek Apartments has any authority to approve or deny the ESA requests, correct?
A No knowledge.
Q And she never stated on the phone with you that she had

authority to approve or deny ESA requests, correct?
A Not to my knowledge.
Q And at no point during this conversation did you request to speak to a manager of hers?
A Correct.
Q And you never followed up or contacted a manager of Tracy Creek, correct?
A Correct.
MS. YONO: I have no further questions.
MR. DAVIS: No questions.
MS. YONO: Yes. I would like an e-transcript.
MR. DAVIS: We would, as well.
MS. YONO: A mini and a full.
(At 1:41 p.m., deposition concluded.)
\- - -