Plaintiff's Response in Opposition to
Defendant's Motion for Summary Judgment

Pl. Exhibit #2
Ohio Civil Rights Commission
Technical Policy T-31

## T - 31 <u>ANIMAL ASSISTANTS AS A REASONABLE ACCOMMODATION FOR INDIVIDUALS WITH DISABILITIES</u>

Ohio Revised Code (R.C.) Chapter 4112 does not specifically reference animal assistants, and there is a dearth of state case law on the issue. The Ohio Administrative Code (O.A.C.), specifically §4112-5-02(C), defines animal assistant as "any animal which aids the disabled." This section references specific examples of what may be considered an animal assistant:

(1) A dog which alerts a hearing-impaired person to sounds;
(2) A dog which guides a visually impaired person;
(3) A monkey which collects or retrieves items for a person whose mobility is impaired.

Though this definition of animal assistant generally applies to all subject matter jurisdiction of the Commission, the unique nature of each protected area requires individualized guidance as it relates to animal assistants and accommodation of disabilities.

For example, allowing an animal assistant in a place of public accommodation is factually an isolated and temporary incident with little opportunity for prolonged communication. In contrast, accommodation in housing contemplates the broadest definition of animal assistants because of elements, such as the right to housing enjoyment, tenant privacy matters, the long-term nature of the relationship, and the right to live independently. For example, inclusion of comfort and therapy animals may be contemplated in housing because there is ample opportunity to communicate about medical necessity.

The Commission takes a moderate approach to animal assistants in employment. An employment accommodation occurs in an environment which is more permanent than a place of public accommodation, but shorter than a housing situation and with less autonomy. This context allows for the interactive process, which affords opportunities for consistent communication about the employee's physical or mental limitations, and how an animal assistant may accommodate the disability. Yet, at the same time, in weighing the need for an animal assistant as an accommodation, other factors, such as safety, cleanliness, and principles of undue burden, may be considered due to the confined nature of the environment.

Finally, an accommodation in higher education constitutes more than the isolated and temporary incident of a patron visiting a public accommodation (Policy T-31.1). The educational environment allows interplay between the student and the institution of learning, much like the context of employment. (Policy T-31.2). Such cases will be viewed with a similar approach, unless the claim pertains to student housing. In such situations, the need for the animal assistant may examined under Policy T-31.3

Therefore, the Commission adopts the following Technical Policies as <u>***interpretive guidance***</u> to staff, charging parties, respondents, and the general public on the applicability of the regulations pertaining to use of "animal assistants" for accommodations in public accommodation, employment, housing and higher education.

## T - 31.1 The Application of Animal Assistants in Places of Public Accommodation

Under R.C. §4112.02(G), proprietors, employees, keepers and managers of places of public accommodation are required to give every person equal access to the full enjoyment of the accommodation, advantages, facilities, or privileges of the place of accommodation. O.A.C. §4112-5-06(A)(4) makes it unlawful to "deny any disabled person in a place of public accommodation the attendance of an animal assistant." Thus, places of public accommodation must make reasonable changes to rules, policies, and practices to afford persons with disabilities an equal opportunity to access places of public accommodation. This includes allowing animal assistants for individuals with disabilities.

The Commission takes the position that in a place of public accommodation, an animal assistant must be trained to perform work or assist in the completion of specific tasks. This interpretation is consistent with the federal rules promulgated by the U.S. Department of Justice on service animals. 28 CFR Part 35 (Nondiscrimination on the Basis of Disability in State and Local Government Services) and Part 36 (Nondiscrimination on the Basis of Disability by Public Accommodations). Under the federal public accommodation regulations, the term used is 'service animal' and is defined as

> Any guide dog, signal dog, or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability, including, but not limited to, guiding individuals with impaired vision, alerting individuals with impaired hearing to intruders or sounds, providing minimal protection or rescue work, pulling a wheelchair, or fetching dropped items." 28 CFR §36.104.

The definition under 28 CFR Part 35 is more comprehensive:

> *Service animal* means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. Other species of animals, whether wild or domestic, trained or untrained, are not service animals for the purposes of this definition. The work or tasks performed by a service animal must be directly related to the individual's disability. Examples of work or tasks include, but are not limited to, assisting individuals who are blind or have low vision with navigation and other tasks, alerting individuals who are deaf or hard of hearing to the presence of people or sounds, providing non-violent protection or rescue work, pulling a wheelchair, assisting an individual during a seizure, alerting individuals to the presence of allergens, retrieving items such as medicine or the telephone, providing physical support and assistance with balance and stability to individuals with mobility disabilities, and helping persons with psychiatric and neurological disabilities by preventing or interrupting impulsive or destructive behaviors. The crime deterrent effects of an animal's presence and the provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks for the purposes of this definition. 28 CFR §35.104.

Similarly, under Ohio law, an animal assistant used to aid the disabled in a place of public accommodation must assist the disabled individual with performing tasks. O.A.C. §4112-5-02(C) provides specific examples, such as a dog that alerts a hearing-impaired person to sounds; a dog which guides a visually impaired person; or a monkey which collects or retrieves items for a person whose mobility is impaired.

For example, if the individual with the disability is unable to see, the animal assistant would have to assist the person in performing tasks that would be more difficult without sight.

In some situations, the disability may not be apparent, but the animal can still qualify as an animal assistant. For example, an animal may qualify as an animal assistant if the animal is assisting individuals with mental health concerns, such as a dog that alerts people with epilepsy to an impending seizure. *Evans v. Watson*, 1993 WL 36073, *2 (D. Or. Feb. 5, 1993). However, the individual with the disability has to articulate how the animal helps to prevent or interrupt impulsive or destructive behaviors. Unlike a housing environment (T-31.3), animals that merely provide emotional support, comfort, or companionship, without more, are not viewed as performing tasks to qualify the animal as an assistant to accommodate patrons in places of public accommodation.

When it is not obvious what service an animal provides in a place of public accommodation, only two questions may be asked of the disabled individual: (1) Is the animal required because of a disability, and (2) What work or task(s) has the animal been trained to perform? See, 28 CFR §§35.136(f), 36.302(c)(6). A proprietor, employee, keeper or manager of a place of public accommodation may not request medical documentation to support the need for the animal assistant and cannot require special papers, cards or insignia for the animal. *Id.*

Furthermore, although the animal assistant is required to be trained to assist the individual in completion of a specific task, the training requirement is not stringent. There is no requirement that an animal complete a certain level of training or be trained for a specific amount of time. Nor, must a patron show a document of training or certification. *Vaughn v. Rent-A-Center, Inc.*, 2009 WL 723166, *10-11 (S.D. Ohio Mar. 16, 2009).

Under federal law, service animals must be harnessed, leashed or tethered unless these devices interfere with the service animal's work or the individual's disability prevents using these devices. See, 28 CFR §35.136(d). Service animals must be permitted unless: (1) The animal is out of control and the animal's handler does not take effective action to control it; or (2) The animal is not housebroken. §35.136(b). If a public entity properly excludes a service animal under §35.136(b), it shall give the individual with a disability the opportunity to participate in the service, program, or activity without having the service animal on the premises. §35.136(c).

The Commission takes a similar position with respect to animal assistants in places of public accommodation. In all cases, it is up to the individual to control the animal. An institution can request that an animal assistant be removed from the premises if the animal becomes threatening, hostile or aggressive and/or if the animal is unusually disruptive, and the animal's owner does not take effective action to control the animal and/or the animal is not housebroken. In these situations, although the animal assistant may be removed, the patron may remain. Finally, akin to federal law, O.A.C. §4112-5-06(A)(4) prohibits proprietors, employees, keepers and managers of a place of public accommodation from requiring the disabled person to pay an extra charge for the attendance of an animal assistant.

## T - 31.2 The Application of Animal Assistants in Employment

Under R.C. §4112.02 and O.A.C. §4112-5-08(D)(4)(d), employers are required to provide reasonable accommodations to persons with disabilities if the accommodation will assist the individual in performing the essential functions of the job or assist in accessing the work site. This includes making changes to rules, policies, and practices against having animals on the property for an individual with a disability, who needs an animal assistant to safely and substantially perform job functions. These changes must be reasonable. Employers are only required to accommodate animal assistants for qualified individuals with disabilities, and accommodation requests should be considered on a case by case basis.

As with other requests for an accommodation, an employer may need specific information regarding the employee's disability and how the service animal's presence will aid with his/her ability to perform job duties in order to properly evaluate the request. When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require the individual with the disability to provide documentation of the need for the accommodation. In order to determine whether an animal would be a reasonable accommodation for a disabled person in employment, the following factors should be considered:

1. What is the nature of the employee's disability?
2. Whether/How the animal assistant enables the disabled employee to perform essential job functions?
3. What is the type, size, weight, and demeanor of the animal assistant?
4. Has the animal received any specific training, and if so, what type?
5. Whether allowing the animal at the worksite would constitute an undue hardship? This includes an analysis of whether the animal:
    a. Involves significant difficulty;
    b. Involves significant expense;
    c. Is disruptive to the work environment; and/or
    d. Requires the employer to alter the basic nature of its business.
6. Whether the animal assistant poses a clear safety or health risk to employees?

Under federal law, service animals must be harnessed, leashed or tethered unless these devices interfere with the service animal's work or the individual's disability prevents using these devices. See, 28 CFR §35.136(d). Service animals must be permitted at the worksite unless: (1) The animal is out of control and the animal's handler does not take effective action to control it; or (2) The animal is not housebroken. §35.136(b).

The Commission takes a similar position with respect to animal assistants in places of employment. In all cases, it is up to the individual to control the animal. An employer can request that an animal assistant be removed from the premises if the animal becomes threatening, hostile or aggressive and/or if the animal is unusually disruptive, and the employee does not take effective action to control the animal, or if the animal is not housebroken. Employees and employers should engage in the interactive process to determine what accommodations are needed at work and also to put parameters in place for the employee to care for the animal and ensure safety and hygiene needs are met.

## T - 31.3 The Application of Animal Assistants in Housing

R.C. §4112.02(H)(16) forbids any person to "discriminate in the terms, conditions, or privileges of the sale or rental of housing accommodations to any persons or in the provision of the services or facilities to any person in connection with the housing accommodations because of disability." R.C. §4112.02(H)(19) provides that prohibited discrimination includes a refusal "to make reasonable accommodations in rules, policies, practices, or services when necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling unit, including associated public and common use areas." The Ohio Administrative Code, supplements the Revised Code, providing: "Every disabled person who has an animal assistant or who obtains an animal assistant shall be entitled to keep the animal assistant on the premises purchased, leased, rented, assigned or subleased by such disabled person." See, O.A.C. §4112-5-07(C).

Animal assistants are not pets. Therefore, "no pets" policies do not apply to animal assistants. They should be treated as an extension of the disabled person; hence, they are not subject to the restrictions that housing providers generally apply to pets. While O.A.C. §4112-5-07(C) prohibits the assessment of a pet fee for an animal assistant, the regulation specifies the disabled tenant is liable for any damages done to the premises by the animal assistant. In making a determination whether an animal assistant(s) is necessary and reasonable in housing, the following factors should be considered:

1. How is the animal assistant necessary to afford a disabled person equal opportunity to use and enjoy the dwelling unit?
2. What is the type, size, weight, demeanor of the animal assistant(s)?
3. Whether an animal assistant poses a clear safety or health risk to other tenants?
4. Whether providing the accommodation would be reasonable in regard to the number of animals an individual requests?

Unlike an animal assistant in a place of public accommodation, (See T-31.1), an animal assistant in housing does not need to be trained. Therefore, an animal that provides emotional support or comfort may qualify as an animal assistant under R.C. §4112.02(H). See, *Falin v. Condominium Ass'n. of La Mer Estates, Inc*. 2012 WL 1110024 (S.D.Fl. April 3, 2012). However, if the need for an accommodation is not readily apparent, the housing provider may request submission of reliable medical documentation of a disability and the related need for an assistant animal. *Overlook Mutual Homes, Inc., v. Spencer*, 415 Fed. Appx 617 (6th Cir. 2011). This request may be only be made *after and not during* the application process.

Finally, it is up to the tenant to control the animal. A landlord can request that an animal assistant be removed from the premises if the animal becomes threatening, hostile or aggressive, or if the animal is unusually disruptive, and the animal's owner does not take effective action to control the animal; or if the animal is not housebroken. In these situations, although the animal may be removed, the disabled tenant may not be asked to leave or be evicted because of the animal assistant.

## T - 31.3.1 Emotional Support Animals (ESA) in Housing

While the topic of emotional support animals sometimes arises in employment, public accommodation and higher education matters, the subject of ESAs is most prominent in the context of accommodation in housing. Under Ohio law, it is an unlawful discriminatory practice to refuse to rent or sell housing, evict, require extra compensation for or harass a qualified disabled individual, who demonstrates a disability-related need for an animal assistant because he or she keeps such an animal in a housing unit. This legal mandate has been relatively well-defined when examining it in the context of a service animal.[1] However, it is less clear when the focus shifts to the topic of "emotional support animals," also known as ESAs.

Due to a myriad of issues, from misrepresentations about the need for an ESA to questions about what animal may qualify as an ESA, some states have enacted legislation in response. The Commission takes a balanced approach when weighing the rights of housing providers to fairly enforce no pet policies and pet deposits and fees, with the legal rights of qualified disabled persons, who need service and emotional support animals as an accommodation of a disability. The agency's stance on the application of ESAs under Ohio's fair housing statutes is outlined below.

- **What is an "emotional support animal?"**

"Emotional support animal" is not yet defined in Ohio discrimination laws or regulations or in the federal Fair Housing Act. Ohio law utilizes the term, "animal assistant," defined as "any animal which aids the disabled." O.A.C. § 4112-5-02(C).[2] An "emotional support animal" has been defined as, "an animal that provides emotional support, well-being, comfort, or companionship for an individual but that is not trained to perform tasks for the benefit of an individual with a disability.[3]" An ESA has also been defined as "a companion animal that a health services provider has determined provides a benefit for an individual with a disability, which may include improving accommodation at least one symptom of the disability.[4]" Emotional support animals are generally considered as a reasonable accommodation for a disability, providing therapeutic benefit to their owners/guardians through companionship.[5]

In the case of an ESA, the animal need not perform specific tasks, but must have a direct correlation in providing emotional support that alleviates one or more symptoms or effects of a person's disability.

- **Who may verify the need for an emotional support animal?**

Under the federal Fair Housing Act and R.C. Chapter 4112, the requester must demonstrate one or more persons living or intending to reside in the unit have a disability, and there must be a relationship between

---

[1] Defined as a dog trained to do work or perform tasks for the benefit of an individual with a disability.

[2] The only reference to an ESA in the Ohio Codes is found in the rules promulgated by Bowling Green State University. "An assistance animal (also known as an 'emotional support animal') is an animal that provides comfort to an individual with a disability within that individual's dwelling unit in university housing.

[3] Wisconsin Statutes Annotated § 106.50(m).

[4] Indiana Code § 22-9-7-6 "Emotional support animal".

[5] Ala.Code §§ 24-8A-2; 24-8A-3; 41 Okl.St.Ann. § 113.2(A); S.D. Cod. Law § 43-32-33; 68 Pa. Stat. § 405.2.

the requested accommodation of an animal and the disability. Once the request is made, a housing provider has a limited right to additional information. On occasions, the person verifying the need for the emotional support animal is at issue. Though not an exhaustive list, the Commission takes the position that any of the following health service providers may have a role in supporting a disabled person's need for an ESA:

i. Physician, including Medical Doctor, Podiatrist, Doctor of Osteopathic Medicine
ii. Ophthalmologist and Optometrist
iii. Chiropractor
iv. Physician's Assistant
v. Psychiatrist and Psychologist
vi. Registered Nurse, Advanced Practice Nurse, Nurse Practitioner and Nurse Anesthetist
vii. Physical Therapist and Occupational Therapist
viii. Audiologist
ix. Speech Pathologist
x. Licensed Counselor, Social Worker or Therapist

There are times when the tenant provides the information about his or her disability or the disability of a family member without more. Other times, the tenant may provide information from a non-medical entity supporting the need for an ESA. For example, a county veteran's services commission sends a letter in support of the tenant's need for an emotional support cat to alleviate conditions of depression, anxiety and post-traumatic stress disorder. In either situation, the housing provider may accept this information in support of the request or may choose to seek additional confirmation from a health services provider. As a note of caution, in both cases, the information is likely sufficient to place the housing provider on notice of an alleged disability and need for accommodation. This information, therefore, must not be ignored. If the housing provider asks the tenant to provide additional verification from a health services provider, a short statement is sufficient. Detailed information or extensive medical records is not necessary to grant an accommodation.

A correlated issue is the subject of health services providers, who are not licensed in the state of Ohio, but diagnose the disability and/or who prescribe the need for an ESA. Through technology, the subject of "telemedicine," is an increasing issue as it pertains to the health care industry in general. Ohio law defines telemedicine as, "the practice of medicine in this state through the use of any communication, including oral, written, or electronic communication, by a physician located outside this state." O.R.C. § 4731.296.[6] Telehealth service means "a health care service delivered to a patient through the use of interactive audio, video, or other telecommunications or electronic technology from a site other than the site where the patient is located." O.R.C. § 5164.95.

The Commission takes the position that a health services provider does not have to hold an Ohio license to verify the need for the animal. First, a provider, who holds a valid Ohio telemedicine certificate, may so attest. Additionally, if the patient has seen a health care professional licensed in another state, the provider may verify the disability or need for an ESA as long as the last contact with the patient occurred within the past twelve months from the date of the accommodation request. The Commission does not recognize non-

[6] The conduct, responsibilities and obligations of telemed providers are outlined in various provisions of the Ohio Revised and Administrative Codes. Health care providers are encouraged to read and follow these regulations. See, *e.g.*, O.R.C. §§ 4731.22(B)(20); 5164.95; 4715.43; 4732.33; O.A.C. § 5160-1-18.

certified providers, who for a fee, will attest to the need for an emotional support animal, without some sort of provider-patient relationship. As a result, if a provider is not licensed in Ohio; does not hold an Ohio telemedicine certificate; or has not seen the patient within the past twelve months, then it is reasonable for a housing provider to require the tenant to obtain updated medical verification from an Ohio licensed or telemedicine-certified provider.

As an example, a college student moves from West Virginia to Ohio to attend school and moves into an off-campus apartment. She requests to bring her cat to live with her as an emotional support animal. The cat alleviates the effects of Asperger's Syndrome. Her family physician in West Virginia last examined her six months ago and provides a certification for her new landlord's review. The landlord must waive the no pet policy and allow the cat to live in the apartment with the student.

In the same example, the student submits a request to an on-line company advertising to issue therapy animal letters to qualified persons within 24-hours of application. The student has no prior relationship with the internet professional signing the letter. The Commission takes the position it is reasonable for the landlord to ask for additional documentation in support of the request, ideally from an Ohio licensed or telemed certified provider. If the student cannot produce documentation within a reasonable amount of time, the landlord can ask her to remove the cat until she produces documentation supporting that she is a qualified disabled person in need of an ESA.

Similarly, if the nexus between the provider and patient is too remote, landlords should give applicants and residents reasonable opportunity to secure appropriate documentation. In the example above, assume the West Virginian physician last saw the tenant when she was 15, and she is now 18. Because three years have elapsed since the health services provider last communicated with the student, the landlord may ask her to find a current health services provider, who can attest to the need for the ESA and should give her a reasonable amount of time to do so.

- **What information is required? What questions may be asked?**

Like all reasonable accommodation requests, the determination of whether a person has a disability-related need for an assistance animal involves an individualized assessment.[7] A housing provider may not ask a tenant or applicant to provide documentation showing the disability or disability-related need for an assistance animal if the disability or disability-related need is *readily apparent or already known* to the provider. For example, individuals who are blind or have low vision may not be asked to provide documentation of their disability or disability-related need for a service dog. Conversely, a landlord may deny a request for an exception to a no pet policy if a person, who does not have a readily apparent or known disability, fails to provide appropriate documentation as requested.

Additionally, a housing provider may not ask an applicant or tenant to sign a release allowing open access to medical records or medical providers or to provide detailed or extensive information or answer extensive questions about the disability.

The Commission adopts the position the U.S. Department of Housing and Urban Development ("HUD") and the U.S. Department of Justice ("DOJ") took in 2004. A housing provider may not ordinarily inquire

---

[7] Sandoval, Service, Therapy, & Emotional Support Animals, Colo. Law. 69, 72–73 (2015).

as to the nature and severity of an individual's disability. However, in response to a request for a reasonable accommodation, a provider may request *reliable* disability-related information that "(1) is necessary to verify that the person meets the [legal] definition of disability (*i.e.,* has a physical or mental impairment that substantially limits one or more major life activities), (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation." See, Reasonable Accommodations Under the Fair Housing Act, Joint Statement of the Department of Housing and Urban Development and the Department of Justice (May 17, 2004).[8]

Once a housing provider has established that a person meets the Act's definition of disability, the provider's request for documentation should seek only the information that is necessary to evaluate if the reasonable accommodation is needed because of a disability. See, *Overlook Mut. Homes, Inc. v. Spencer*, 666 F.Supp.2d 850, 856 (S.D.Ohio 2009). Accordingly, persons seeking a reasonable accommodation for an emotional support animal may be required to provide documentation from a physician, psychiatrist, social worker, or other mental health professional supporting that the animal provides support that alleviates at least one of the identified symptoms or effects of the disability.[9]

Finally, the Commission has observed lease applications with overly detailed questions concerning medical information reaching far beyond the scope of what is allowable. Similarly, the Commission has observed lease language threatening pet violators with criminal penalties or litigation. This is not only unnecessary, it is discouraged as it gives the appearance of intimidation or coercion, which is unlawful under Ohio law.

- **Does the animal have to be trained or certified?**

There are companies, predominantly internet-based, that advertise providing registration and certification of pets as emotional support animals, including vests and tags, for a fee. Housing providers and rental agents cannot require a special certification, identification card or training documentation for the ESA or ask that the animal demonstrate its ability to perform work or a task. Therefore, such companies are irrelevant for purposes of R.C. Chapter 4112.

However, a landlord is entitled to request medical information demonstrating both a qualified physical or mental condition that substantially limits one or more major life activities and proof from a health services professional that the animal improves the effects of the disability. Production of certification via website or internet, without more, will not suffice.

- **How many animals are allowed?**

Generally, one ESA is sufficient. However, the number may vary depending upon the number of residents and the type(s) of qualifying medical conditions necessitating the ESA. In all cases, an appropriate health

[8] *Ajit Bhogaita v. Altamonte Heights Condo. Assn., Inc.*, No. 6:11-CV-1637-ORL, 2012 WL 6562766, at *6 (M.D. Fla. Dec. 17, 2012) *aff'd sub nom., Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277 (11th Cir. 2014); *Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617, 621-22 (6th Cir. 2011); *Hawn v. Shoreline Towers Phase I Condominium Ass'n, Inc.*, No. 3:07–cv–97/RV/EMT, 2009 WL 691378 at * 7 (N.D. Fla. 2009), *aff'd* 347 F. App'x 464 (11th Cir. 2009); *Kennedy House, Inc. v. Philadelphia Comm'n. on Human Relations,* 143 A.3d 476, 489–90 (Pa. Commw. Ct.2016).

[9] Pet Ownership for the Elderly and Persons with Disabilities, 73 FR 63834-01.

services provider must verify the need for each animal for independent purposes (i.e. one animal alerts a child of impending epileptic seizures, while a second animal ameliorates the effects of a mother's high blood pressure). Reasonableness is factored into this standard. For example, the Commission acknowledges it would likely be an undue hardship for a landlord to waive a no pet policy to allow 15 cats in a one-bedroom apartment. Again, the number of animals allowed is best determined on a case-by-case basis.

- **What type(s) of animals may qualify as an ESA?**

Unlike a "service animal" under federal law, or "animal assistant," as defined in Ohio law, it is the Commission's position that an emotional support animal is not limited to any particular type of animal, such as a dog or cat, but reason must come into play. Unlike a service animal, an ESA is not specifically trained to perform tasks; however, the animal's presence must provide some sort of therapeutic or other benefit to an individual with a disability. An ESA may be viewed as a "reasonable accommodation" in a housing unit that has a no pets rule or pet fee for residents.[10] Therefore, an ESA may be a cat, a bird, a hamster, a rabbit or some other domesticated animal.

Housing providers are not required to provide any reasonable accommodation that would pose a direct threat to the health or safety of others. Thus, if the particular animal requested by the individual with a disability is a wild animal or a domesticated animal with a *history* of dangerous behavior, the housing provider does not have to allow the animal in the housing unit. Moreover, a housing provider is not required to make a reasonable accommodation if the presence of the assistance animal would (1) result in substantial physical damage to the property of others unless the threat can be eliminated or significantly reduced by a reasonable accommodation; (2) pose a significant undue financial and administrative burden; or (3) fundamentally alter the nature of the housing provider's operations.

Landlords should treat each situation on a case-by-case basis and not deny an ESA simply because of the breed of the animal, such as a pit bull or mixed breed dog.[11] Ohio law was amended to remove breed specific restrictions. If concerns are raised, more exploration can be conducted with the disabled person about the animal. Landlords are encouraged to seek additional legal guidance when necessary.[12] In severe cases where certain breeds are strictly banned (e.g., the Village of Golf Manor Ordinance 505.18 bans pit bull terriers), the Commission may deem the municipality a necessary party to the case to effectuate an appropriate resolution.

---

[10] Wisch, Animal Legal and Historical Center, FAQs on Emotional Support Animals (2013) www.animallaw.info. *See also* HUD, February 17, 2011 Memo, Sandoval, Serv., Therapy, & Emotional Support Animals, Colo. Law. at 70; Ala.Code § 24-8A-3.

[11] The Commission recognizes that several Ohio municipalities still have ordinances on the books declaring certain breeds, such as pit bulls, as "dangerous" or "vicious," despite changes to Ohio law removing them from the definition of "vicious dog." In such cases, the housing provider, upon satisfactory proof the animal is an ESA or service dog, should permit the dog in the unit. The provider should also seek legal guidance concerning compliance with the ordinance, such as requiring the tenant have the requisite amount of liability insurance, until the issue can be resolved.

[12] See, O.R.C. § 955.11; *Russ v. Reynoldsburg*, 2017-Ohio-1471 (Licking App. April 19, 2017) (finding city ordinance banning pit bulls outright conflicts with state law abolishing breed-specific restrictions and unconstitutionally exceeds city's home rule authority). See also, *Warren v. Delvista Towers Condominium Ass'n, Inc.,* 49 F.Supp.3d 1082 (S.D.Fla.2014) (Miami–Dade County breed-restriction ordinance preempted by the FHA).

- **What other factors should be considered?**

An individual with a disability, who keeps an emotional support animal in housing, accepts liability for sanitation and damage to the premises caused by, the animal. Any determination that an emotional support animal poses a threat of harm to others or would damage the property of others must be based on an individualized assessment of the specific animal's actual conduct. The assessment may not be speculative and may not be based on evidence of harm that other animals have caused.[13] If therapy or service animals cause damage, housing providers may certainly seek restitution for the damages caused; however, service and emotional support animals *are not pets.* Therefore, pet fees and deposits must be waived.[14] Conversely, animals that do not meet the criteria and conditions outlined will be considered pets. In such instances, landlords may enforce no pet restrictions or pet fees.

Finally, the Commission acknowledges a housing provider may have legal rights if a person obtains a reasonable housing accommodation by knowingly making a false claim of having a disability that requires the use of an assistance animal or by knowingly providing fraudulent supporting documentation in connection with an ESA. Those remedies are beyond the scope of R.C. Chapter 4112 and may be more appropriately raised under the Ohio Landlord-Tenant Act. In the rare instance of proven abuse, the Commission will take appropriate action to dismiss the case.

[13] Notice FHEO-2013-01 at 3; *Castellano v. Access Premier Realty, Inc.,* 181 F.Supp.3d 798 (E.D.Cal.2016).

[14] Additionally, absent restrictions or requirements in state statute or vicious breed ordinances as outlined above, unreasonable restrictions or limitations on emotional support or service animals, such as confinement to the housing unit or containment to specified areas is not permissible. For example, forbidding the animal to be in the common areas, or asking a tenant to use the service elevator and service entrance when the animal accompanies the resident, will be considered a violation of R.C. Chapter 4112. Similarly, absent legal requirements, the Commission discourages requiring additional liability insurance, vaccinations or veterinary records for service and emotional support animals.

## T - 31.4 The Application of Animal Assistants in Institutions of Higher Education

R.C. §4112.022 makes it unlawful for an educational institution, which is defined to include state and state-assisted universities and colleges, nonprofit educational institutions and career colleges and schools – to discriminate against any individual on account of any disability. Educational institutions may not discriminate in admission or assignment of programs, classes, and programs; in participation in activities of school-sponsored property; with respect to the award of financial aid and benefits; in admission or assignment to campus housing; and in awarding of grades, diplomas and degrees. See, §§4112.022(A)-(E). Akin to federal law, Ohio law allows qualified disabled students the right to have an animal assistant on campuses throughout Ohio to aid them in their educational pursuits.

The federal regulations supporting Titles II and III of the ADA, as well as 504 of the Rehabilitation Act are generally applied to service animals in academic environments. Under these regulations, the animal must be trained to perform work or assist in the completion of specific tasks. See, 28 CFR Part 35 and Part 36. See also, Policy T-31.1; O.A.C. §4112-5-02(C). Animals that merely provide emotional support, comfort, or companionship without more are not viewed as performing tasks as required for animal assistants in educational institutions, which are akin to places of public accommodation. However, with respect to campus housing, students may be protected by the fair housing provisions of the federal Fair Housing Act, as well as Ohio's Fair Housing Laws. See, R.C. §4112.02(H). Therefore, situations involving students in need of comfort or emotional support animals in campus housing will be examined on a case by case basis. See, *e.g., United States v. Univ. of Nebraska at Kearney*, 940 F.Supp.2d 974, 975 (D.Neb.2013). (U.S. Department of Justice permitted to bring lawsuit against University for violations of Fair Housing Act for refusing to allow a student diagnosed with depression to keep a prescribed therapy dog to respond to anxiety attacks in University-owned off campus housing). (See T-31.3).

Under federal law, service animals must be harnessed, leashed or tethered unless these devices interfere with the service animal's work or the individual's disability prevents use of these devices. See, 28 CFR §35.136(d). Service animals must be permitted on campus unless: (1) The animal is out of control and the animal's handler does not take effective action to control it; or (2) The animal is not housebroken. §35.136(b). If a public entity properly excludes a service animal under § 35.136(b), it shall give the individual with a disability the opportunity to participate in the service, program, or activity without having the service animal on the premises. §35.136(c).

The Commission takes a similar position with respect to animal assistants in institutions of higher education. In all cases, it is up to the individual to control the animal. An educational institution can request that an animal assistant be removed from the premises if the animal becomes threatening, hostile or aggressive, or if the animal is unusually disruptive, and the animal's owner does not take effective action to control the animal; or if the animal is not housebroken. In these situations, although the animal assistant may be removed, the individual, whether a student or visitor, cannot be required to leave because of the animal. Finally, students of and visitors to Ohio's educational institutions may not be charged a special fee or penalized for bringing an animal assistant to campus.